My name is Cosmo Taddeo and I represent the appellant in this matter, Courtney Mayes. I will first start off by apologizing to Justice O'Brien. You may hear some similar arguments that you heard this morning in the matter of People v. Mr. Moore. The issues here are fairly clear. Did the court err when it denied the defendant's motion to coerce, arrest, and suppress evidence? Not only at the time that they were transported to the police station, but also at the time in which the detective said that Mr. Mayes was under arrest based on anonymous tip that was corroborated by some independent witnesses. Further, did the court err in denying the defendant's motion to suppress statements, both based on the eavesdropping statute and based on the homicide statute, wherein where can statements be recorded? In order to start this analysis, we have to determine when the defendant was considered in custody. In order to do that, I asked the court to look at the cases of People v. Jackson, People v. Arnold, and United States v. Glenn. I'm going to start my analysis with the court held in People v. Arnold when arrest-like measures such as handcuffing are employed, they must be reasonable in light of the circumstances that prompted the stop or that developed during its course. If the use of such restraints is not necessarily reasonable for safety under the specific facts of the case, their use will indicate that the encounter should be viewed as an arrest. What do the facts show in this case? There was a 911 call in which police were dispersed to a resident location. Officer Fasano was the first person who showed up at the scene. He indicated he saw two individuals in the driveway, being both Mr. Mays and Mr. Moore. He got there with the sirens on, and he got there with his gun drawn. He asked both individuals to get to the ground, to spread their arms, and at that point they were handcuffed. That would be reasonable under People v. Arnold. But then what you've got to look at at that point is you have two more officers that arrived on the scene, Officer Wagner and Officer Rimjes. Officer Fasano testified in front of the trial court that at the time you placed the handcuffs on the defendant, what was it for? He said officer safety. Was there a point in which you were not concerned about officer safety? Officer Fasano indicated yes, within one or two minutes after they were secured, we were not concerned with officer safety. But isn't it true that you still kept these gentlemen in handcuffs? Officer agreed. In determining whether they're in custody, People v. Jackson laid out ten standards, and I'm going to go through that as I go through the facts. You have two individuals. It was identified in the scene that Mr. Mays was the one that called the police. He was the one that called 911. He was separated from Mr. Moore at that time, handcuffed, and put in separate squad cars. At that point, a reasonable person would believe that they were in fact in custody. Even the officer who transported Mr. Mays testified it was because he was considered a suspect. We did not know what his involvement was at that time. Mr. Mays was transported to the police station. And when he got to the police station, you heard testimony in the trial court level from Officer Rimjicks, who indicated that he could not take the handcuffs off of Mr. Mays until directed to do so, which evidence showed that wasn't in fact entirely true. Mr. Mays actually threw up in the squad car. His handcuffs were taken off only to allow him to use the bathroom, and then his handcuffs were put on again. In People v. Jackson, the court said we should look at the time, place, length, and mode of encounter. At the time that Mr. Mays was taken from the scene, not only were the three original officers present, there was testimony that there was at least two to five more that were present prior to Mr. Mays being transported to the police station. Then you look at any indication of formal arrest. Handcuffs were used. The intent of the officers. There was testimony we didn't know what their involvement was. The subjective belief or understanding of the defendant. Well, the defendant had keys to a car that was at the scene. He wasn't allowed to transport himself to the police station, which is contrary to the other witnesses being Barry and Smith, who were given a ride by the police officers but were not handcuffed. It shows that at that time, the officers believed that Mays and more for that aspect had more involvement. They were in custody, and I would argue they were under arrest at that time without probable cause. Now, you have to look at, was the defendant told he was free to leave? And that's the one statement that the state wants to say, is once they got to the police station, even though they were taken to a lower part of the police station, in a secured area of the police station, in a room ten by ten, there was testimony that there was two doors, but that there was an officer present, and that the defendant, Mr. Mays, could not have gone anywhere without the permission of the officers. In fact, there was testimony that Mr. Mays wanted to have a cigarette. He could not leave to have that cigarette unless there was an officer following him every step. Now, the state argued at the trial court level, well, it was for the convenience of Mr. Mays. Well, if it's convenient for Mr. Mays, then he's free to go. Why don't you just let him go have a cigarette and then walk back into the police station? Why? Because he was under arrest. And if you take a look at the statement by the officers and the detectives when he got to the scene, I'm sorry, when he got to the police station, they contradict each other. Three of the detectives indicate they never told the defendant he was free to leave. It was one detective, I think it was Liberian who testified, and Detective Deutschler is the one who said that you were free to leave. But I asked the court to consider People v. Gorman, and they took a look at a statement like this. Although the police may tell a suspect that he's free to leave and that he's not under arrest, a suspect may still reasonably perceive that he's in custody. Any control over that person by the police suggests custody. There was total control here. He was not free to leave. Even when he wanted to have a cigarette, he was told that he had to go out with the officer. He was not free to leave. Let's take a look when he is in the secure room downstairs. Is he free to leave? Well, they took his clothes from him, and he's in a going-to-jump suit. Didn't he agree to cooperate with the police and voluntarily gave up? I mean, voluntarily agreed to cooperate? Well, I would argue with the court that is not totally correct. And that's a statement allegedly given by the detectives that Mr. Mays agreed. I don't think he had a choice whether he could agree or not. He didn't have access to his cell phone because they took his cell phone. He didn't have access to clothes to call a family member and say, hey, bring me my clothes. He also didn't have access to Mr. Moore. And the case law there says if you're separated by family and friends, and by that time they learned that Mr. Moore was actually his cousin too, and people view Lucas, the Supreme Court held, the absence of friends and family is a consideration that this is actually an interrogation. Well, he was told he was free to leave. The officer said he was free to leave. Did he ask to leave? Judge, there is no evidence on the record that he asked to leave. I mean, he voluntarily cooperated with the officers. Judge, I would disagree with that, and I would like to. Didn't one of the officers say, in fact, that if he had tried to leave, I would have stopped him? I wouldn't have let him leave? That's correct, Judge. That was, I believe, Officer Rimjo stated even if he wanted to leave, he could not leave. But I ask you to look at the defendant's own words in the second interview that was done on April 1st of 2008 at 445. He said, and I quote, and this is at a time in which a defendant is allegedly free to leave. Why? Why am I the only one that you're holding? Does this sound like somebody that believes he is free to leave? It does not sound like he is free to leave. Well, is it his perspective alone, or is it against some objective standard? It is an objective standard also based on his subjective belief. You also have him testify in front of the trial court. He was specifically asked, did you feel free to leave? He said no. The state didn't contradict any of that. They didn't even cross-examine him. So I have to think you have to take that in the totality of the circumstances. So the question comes is, when do you consider that the defendant was in custody? I believe that it was against the manifest weight of the evidence to say the defendant wasn't in custody at that time. You've got a person who was taken from the scene, who was secured for his safety, who doesn't have access to his motor vehicle, his cell phone, and he's asked to consent to a search of his cell phone and his motor vehicle. That is not the police thinking that they have a witness on their hand. That is a suspect. If he's in custody at that time, I'm going to ask the court to take a look at when statements may be used from an accused. That is 725 IOCS 5-103-2.1. The trial court stated at that point the defendant wasn't in custody. And I believe that is an erroneous statement at that point being transferred to the police department in a secure room that he's not in custody. If this court believes, which I believe the facts show, that he is in custody, he's in a place of detention, and that he's being subject to interrogating questions, and I believe if you look at the video or the audio of the second interview when the police are specifically saying, is we know that something else happened here. No, no, you listen to us. We know that there's always somebody inside that has knowledge of this. He was being looked at as suspect. And if he's in custody at that time, the law finds that any oral or written statement of the accused as a result of a custodial interrogation at a police station or other place of detention shall be presumed to be inadmissible as evidence. If you consider him in custody on April 1st, 2008, at 2.20 a.m., and it was feasible to do an audio statement, and I think there's no question about it because they had audio statements already done, you have to throw out every single one of these taped statements. There was one statement at 2.20 which wasn't taped. They had the feasibility to do that, which means they violated the statute as I just indicated. The statute says if you violate that, every other interview that you do has to be thrown out. If those statements are thrown out, then you really have no evidence against the defendant about his statements. What the court did say is, we believe he wasn't in custody, so I'm going to say that the eavesdropping statute applies. This statute has no teeth to it. What this allowed the state to do is to throw out a statement saying the eavesdropping statute applies, even though the officers committed a class 3 felony, which is punishable by 2 to 5 years, and they taped the statement. So what does the judge say? Okay, I won't let the statement in for that one statement, but I'll let them testify to it. What deterrent are we as an appellate court saying to the police? Go ahead and violate the law. You have no ramifications. The worst thing that's going to happen to you is we'll let you testify to the statement. So saying that we violated the eavesdropping statute and saying they can still testify really doesn't do anybody any good. However, what this judge should have done, he should have taken it one more step further in saying since they violated the statute, committed a criminal violation, every other statement should have been thrown out too, but he didn't hold that. And that's what I argued in front of the trial court. Now, I'm also going to argue about the tip. Even if you believe that there was probable cause or no probable cause at the time that they were placed in handcuffs, at the time, at April 1, 2008, there was testimony from the detectives that a determination was made by Detective Cunningham to release the defendants. Now, there's some inconsistencies here, and the inconsistencies is the officer first testified and, oh, that determination came at 2 o'clock. Then under recross or cross-examination, he says, I made a mistake. That came at 3 o'clock. No, you know, let me strike that. I made a mistake again that came in 340. Thank you. That came at 340 here. So once you have additional that the officers could have considered in determining that now that there was probable cause to arrest the defendants, you have a hearsay-within-hearsay or double hearsay statement in which the court even stated it was in no position to determine the reliability of the person providing the tipster with the information. In fact, the court held there was no evidence as to the informant himself determined her reliability. Obviously, there would be more of a presumption if the person had a track record had been used before. We also would know that if the person had made direct observations and was contemporaneous with what had happened, the court would consider that more on the reliability section. But this person was saying, well, I'm telling you what somebody else told me because they were afraid to call you. Look at the statement itself. What the judge did here is he jumped. He said, based on what Smith and Barry said to the officers, that there was somebody making phone calls. That's enough to corroborate that somebody was a set-up man. That's not enough here. All that we have here is somebody allegedly using their cell phone. Did you hear that there were three individuals who left the house prior to the shooting? Did you hear that there was an individual, Mr. Warren, in the house who also used his cell phone but it went dead? That's why he couldn't call the police? That in itself is not sufficient to find that there was probable cause at that time. What the judge did is he heard testimony. After motions to suppress, he heard all the evidence in the case. Instead of dividing that evidence out and saying, well, I can't consider this because at the time of 350, nobody knew that, he considered it all. You can't say, okay, this is a good arrest because now they've done their research and investigation and now I can see that this is a good arrest. At 350, they had no knowledge about Mr. Harper. They had no knowledge of conclusions or corroboration that Mr. Harper had any involvement other than the tipster. I'm asking the court to consider that they were in custody at the time that they were placed in the squad car and at the police station, and because their statements were violative of when statements can be used by a homicide case, that these statements and any evidence should be suppressed, and I ask that you so find. Thank you. Counsel. I please the court. Good afternoon, Your Honors. Counsel. This case has some unusual aspects to it. However, I think all of them are explainable. And the first thing I want to do is somewhat short-circuit counsel's argument, at least for the first few minutes. We conceded that he was, in our briefing here, that he was in custody at the time that he was at the scene, had guns pointed at him, was handcuffed, and was transported to the police department. Can I ask a question with regard to the tip? At the time of the tip, the officer knew at that time a murder had taken place. Correct. And they knew that there were two suspects at the place. They knew there was a phone call made from the place. Correct. Right? Correct. So they knew all those things, and then there's further cooperation when there was the tip. Correct. Yes, I mean, and there's an officer, I believe Griffith, testified that there also had, at the time, names of Terrell Jackson and Richard Martin. There was some blood on the clothing. Yes, there's blood on apparently both Moore and Macy's, or Mr. Macy's clothing. That's why they asked him for the clothes. They didn't just take his clothes. They said, hey, look, you've got blood on your clothes. We'd like to have that. Would you give us your clothes, and we will give you half, which is, unfortunately, it was just an orange jumpsuit. So that's what they gave him. As far as taking the cell phone, apparently the cell phone was in his clothes. They didn't say, give me your cell phone. They didn't then say, oh, hey, can we look through your cell phone? And then they got his consent to look through his cell phone. It wasn't simply, give me it, and we're going to look through it. But at that time, I thought you stated in the earlier hearing that they did not know at that time that Mr. Mays had made phone calls from the residence. And he would call 911, right? Right. He had received two phone calls prior to the shooting. And I believe that was Mr. Berry who testified to that, as well as Mr. Mays giving that statement. So there was some independent statement by Mr. Berry. But when did they know that from Mr. Berry? They had interviewed him around 2 o'clock or 2.20 in the morning of the 1st. So what they have at that time is they have blood on his clothes, and he admits that they had his house was happened. He has no weapon, and that he had received two phone calls. Correct. It was Eric Smith. I'm sorry. It was Eric Smith and Michael Berry. They had already talked to them around 2 or 3 a.m. on 4-1. That's hours and hours before the tip came in. So they're aware of that information. Well, are they aware that they had made a phone call from the residence? Well, that he received phone calls right before the shootings took place. I believe there were two calls. The defendant claimed one was from his girlfriend. The other was from a girl named Lizzie or something like that. So there was some corroboration that he received those calls. But they were immediately reported, well, not immediately, but shortly before the shootings occurred. So there was some corroboration from the tip. So Mr. Smith and Mr. Berry had been interviewed. They knew, as we said, regarding the shooting, that there was blood evidence and all these other things, and the informant told them that the police had two people in custody, or not in custody, let me rephrase that, at the station who were the set-up people. So, and Mr. Mays being one of the individuals that the police knew that they had, that's at least prerogative of all the other, you know, it's a totality of the circumstances when you're viewing whether or not the tip is liable. Physical description doesn't match. Names, nicknames don't match. She wasn't there. They don't know. They've never dealt with her before, presumably. I mean, there's nothing that indicates that she is reliable or that she had reliable information. Well, she knows that there's a shooting. She knows that there's two people. They knew that there were two shooters or two people had stormed in. They knew that there were two people who were present, at least present in the police. They were at the police station. That seems pretty reliable. And people in Alabama v. White, the United States Supreme Court said, you don't have to have all the facts right. You can have some things right and some things not right. That's why you need some corroboration by the police. And they had talked to the police. What was the indication about where the gun could be found? Yes. They also said it was Mr. Harper. I believe it was his girlfriend or mother who would either one of two vehicles that were specific. It was probably the SUV. The SUV is at this location. They don't corroborate that at that time. Not at that time, no. They don't have that information at 350, where the weapon's at. They have not found Mr. Harper at that time. Correct. They have not found Mr. Harper at that time. But they were going to let Mr. Reyes walk out the door right then. They have a lot of information. They have this anonymous tip. How does information and anonymous tip about a weapon, if they haven't corroborated, how is that our cause to hold him? But you have to look at the totality of the circumstances. Yes, there are things that aren't corroborated yet. There are things that are corroborated. There are things that are given sufficient cause in order to hold him for additional questioning, which is what they did. They came down. They said, we need to talk to you about these other things. They Mirandized him. They gave him his rights. He waived his rights. He gave us the standard, more or less standard police type of procedure. And there's nothing, really, ultimately, the weird things about this case are you had the defendant brought into the police station in custody initially. He's told he's free. Officer, Detective Liberio tells him, hey, you're free to go. His testimony, page 372. How about the other officer, Room Zitis? Well, he only said, well, no, he wasn't free to go. But he didn't tell that to Mays. Liberio tells Mr. Mays, you're free to go. But we need some, we have some information and statements we need to obtain. And he agreed to stay as long as we needed him to stay. How about the other officer? He indicated, said that he wouldn't have been free to go. Not to him, though. And we're looking at his state of mind as far as whether a reasonable, innocent person believed that they were in custody at that time. Detective Bish said he told the defendant that he appreciated his cooperation, that they may have more questions when they were finished talking to everyone else. The defendant did not ask to leave the station. He did not ask, oh, the defendant responded it was not a problem. Detective Deutschhorn. What time was that? That was at the interview around 2.20 a.m. So before the 10-hour period begins? Well, approximately. Yes, more or less. Does anybody have any contact with these individuals or any come in, they've got more questions, hey, we want to ask about this during that period of time, do we know? It's not clear that they have, they're going in and out necessarily with a lot of things going on. Now, walking a fine line, because counsel refers to a transcript that is not an official transcript of the DVD. It's apparently defense counsel created it, so it's not referred to below in any capacity. So I'm not sure exactly how officially you can rely upon that. Second, there was a comment regarding, the defendant said, why are you keeping me here? And he was told, the response, no, everyone is being asked to stay here. Everyone is being treated the same way. So I don't really want to rely upon that transcript because I don't think you can rely upon it. But if you go look at what the totality of it is, if you are going to rely upon it, you need to consider totality of circumstances. That's just a couple, maybe one page of what occurred during a fairly long interview. Can I ask you again about, because I want to go back to his state of mind. These interview rooms are side-by-side. It's my understanding Mace is in one, Morris in the other. Mace, the officer, well, the detective of burial says, hey, you can go ahead and go. And he leaves, detective of burial. Ramzides, though, is standing outside of this interview room. Correct. And he testifies that, hey, he was not free to go. And we have the defendant who says, I didn't think I was free to go. I mean, they say, that's their argument here, is that they weren't free to go. So how is it that you can say, just because one detective says you can go and then he leaves and walks away, and the other one is physically present outside of the door, that a reasonable person would think, well, I better listen to one police officer over the other. Well, there's no evidence, A, that Mr. Mace was aware that the detective was outside of the door. Second, after that happened, after he said, well, I wouldn't have let him leave, Bish and Dewitchler both go in there and tell him, you're free to go. Thanks for your cooperation. And he says, hey, I'll stay here. Dewitchler tells him, she was sorry this was happening. You need to continue to be a good listener. As we were mindstanding and talking to the detectives about what happened, the defendant responded he would do whatever he needed to do to help catch who did this. And that's his state of mind. I'm going to stay and help. So, I mean, his argument that, boy, he must have been, because the detective was outside the door, thought in his head he's not going anywhere. Everyone else who talked to the defendant told him, you're free to go. Hey, you're free. Please help. And he says, yeah, I'm happy to help. So if he's happy to help, why shouldn't he stay? Why shouldn't he do those things to help them answer the questions as they're doing this investigation? This is an ongoing investigation. Because he's free to help and they put him in an orange jumpsuit. Well, that's because that's all they happen to have. I mean, if they had had a nice change of clothes, I'm sure they would have given it to him. But, unfortunately, the police have what the police have. I don't think they'd want to give him a uniform. That would probably be inappropriate. But at the very least, we have what they have. And as far as escorting him out for cigarette gas convenience, also, it's a police station. People can't just wander around. So they take him out to the door. Make sure he's 15 feet away from the door when he's doing his cigarette. Then comes back in and bring him back in for further cooperation. People can't come in and out of the front door upstairs? They didn't take him back upstairs. I mean, I just don't know. Is it standard that you take a witness out through, like, the employee-only area and the detention area when, I mean, I would presume that had I witnessed a car crash and I'm a witness, if I want to go outside the front to smoke my cigarette. Then, you know, you don't. And if I'm a witness, do I need the police officer coming with me? Sure, he's escorting you through the police. You're not in the front lobby when you're making this statement. Right, but if he's free to go, why is anybody escorting him? I'd be like, hey, you know what, there's the door. I'm not your, you know, I'm at the bellhop here. You know, it's a police station. I'm a police officer. If you're just a witness, you want to have a cigarette, you know, there's the door. I'll be here or here's your chair. Except you can't just walk. This is a witness interview room. You're walking through the police station in an area that's not open to the public. This is a public area. You could say, yeah, there's the door. This isn't McDonald's. You can't just say, walk in, say, oh, there's the door, go. You got to say, okay, I'm going to take you to where you need to go to stay off your cigarette, and then I'll bring you back. Well, when does it become public? The police go outside the door. Sure. Okay. Is that a public area outside the door? I'm not real clear exactly. Is it an alley? If it's an alley, then that's a public area. If it's a police, you know, ultimately, does it matter? My point is, to take him to, in order for the escort to occur, it's because where he's going through and where he's coming back from. It's not a public area where he can just walk out and walk back in. But why isn't he in a public area for these ten hours where nobody's interviewing him, nobody's talking to this witness? Why is he taking up space in this interview room, and they're using all of these police resources to hover around and escort him and have his cigarette? I know he's, I mean, you know, we've talked about it. He's in this orange jumpsuit. Well, maybe that's a little ridiculous, but you know, when he goes out, he has a cigarette. If he chooses to, pushes the buzzer, and somebody lets him back in. He's a key witness. He saw what happened. He saw somebody come in. He had blood all over him. They wanted to make sure that he is. He stays there? Is that what they want to make sure? They want to make sure that he is protected. Protected from what? I mean, you say you want to make, they want to make sure he's protected. No, no, I mean, from what? If he's a witness, you say he's a key witness, and they want to make sure he's protected. He's not safe at the front entrance of a police station in Naperville? It's, again, we're talking about where he's going through. I mean, if this was a lobby, yeah, go out there. Go ahead and have your cigarette come back in. They have to escort him somewhere. Escort him all the way out the front entrance. And then say, you know, he's only a witness. If he's not in custody and he's being detained, go out and have your smoke. Why do they need a police officer? I'm a taxpayer. Why are you escorting a witness and standing by him? There's a buzzer that will let people, I mean, why? Convenience. I mean, if you're still talking to him, you're still doing an interview with him. But they aren't. This is, this is, no, it's happening. It has been happening. And if it's voluntary, then they've got to be pretty sure he's coming back. And if it's not voluntary. But let's look at his statements. Thank you. His statements were, I will stay and I will help you in any way I can. Well, doesn't that mean that you can let him in and out, that he should be able to go outside and you can trust him to come back in? Because if they don't, I think you've got a problem. What's his state of mind, though? I'm going to help you. I'm going to stay. That's what we care about. Is his thought process, well, they're escorting me out for a cigarette, therefore I can't leave? No, he's simply thinking, okay, I'm going to help you. I'm voluntarily staying to help. That's what he said. That's the undisputed testimony. So if you were a witness somewhere and you said, hey, I have to take a smoker, I have to go to the bathroom, and the policeman came with you, you just thought, God, these are great guys hanging with me. If I didn't know where I was supposed to go or how I was supposed to get back in, then, yes, I do want to be escorted. How many buildings have you been to that have security that you have to call up and somebody comes down, escorts you in, has to go back up, and then they have to escort you out? I can tell you when I practice law, when I've gone on occasions to an after-hours police station and had to go back out to a car, come in or something, nobody ever said, let me escort you. You ring the bell, you come back in the same way you went out. Nobody dropped everything they were doing to hold my hand. You were probably considered a familiar. You weren't somebody who has not previously been a guest. How long was this person a guest before he was arrested? Before he was arrested, he was escorted or brought to the station. First they interviewed about 2 a.m. So about 10 or so hours before he was officially taken into custody. It was about 3.40, 3.50 when he was taken into custody. So he was free to go for 10 hours? Sure. The case law, Perez and, pardon me. Perez and Fair, Perez in particular, defendant is, please go, say hey, I'd like to talk to you, bring him in on September 25th at about 8 a.m. Or 8 or 9 p.m., sorry, excuse me. He's there. Next day, police officers say, well, 4.30 on 4.26, and he's still there. He goes with the police to point out where an apartment or an alleged defendant, whatever it was, but he stays in the squad car. Escorted back to the police department, taken back to the police department. On 9.27, 48 hours, about 7.30 p.m., 48 hours later, that's when he makes incriminating statements, that's when he's arrested. We have a 48-hour period. Here it's just 10 hours. He's agreed to stay as long as necessary. He hasn't asked to leave. He hasn't asked to go anywhere. He hasn't asked to do anything.  They give him food. They let him go to the bathroom. There's limited freedom because it's a police station and not a public access area. That's time. I've got one. They took his clothes away from him. How long was he there when they took the clothes away from him? He voluntarily gave them his clothes. It was during the, I believe it was during the first interview, so it was probably about 9, 8 or 9 hours because it was towards the end. They gave him the jumpsuit. He voluntarily, you know, let him go. He changed his clothes without anybody there watching him, and then they let him. Now, could he have called somebody? He didn't ask to. Why wouldn't he do that? Well, maybe because he wanted to see what they were going to do to him. Remember, we're talking about a reasonably innocent person. What would they do the same? Anyway, we've asked that the affirmed. Thank you, Counsel. Counsel, you may proceed. Thank you. Your Honors, we have police in court. Justice O'Brien, I'd like to touch upon one of the questions that you asked in direct examination. I'm sorry, when you asked counsel on his case. You asked about whether the defendant considered himself free when he was escorted out of the police station. What counsel fails to tell you is that my client did ask to make a phone call. And the officers testified it is not common to go ahead and follow a person to go make a phone call. Not only was my client followed, but the officer actually took a report on the phone call that Mr. Mays made. Some other distinguishing factors is that the defendant was in custody 13 hours. Not the 10 hours, as counsel would like him to believe, but 13 hours over from the time that he was taken to the police station. And he was asked for his clothes pretty much right away in the first interview. I would agree with that. But it takes into consideration of whether a reasonable, prudent person would believe they were in custody at the time. And I implore with this question, is why would Mr. Mays ask for permission if he did not believe he was in custody? He had to ask permission in order to make a phone call, in order to smoke a cigarette. If he was free to leave, then why is he asking, how long do I have to be there? I'm cold, I have to pick up my brother. What the state has argued and asked you is not to consider the transcript that was developed and made part of the record. The state's attorney's office in the trial court never objected to that record. Never objected to that argument in the trial court. But even if the court here does not want to consider that record as transcribed by the defense, I'd ask the court to simply do this. I'd ask the court what was put into evidence was the actual videos. The court could listen to it for itself. I don't believe it needs to because it's already in the record. And in the record, you have an individual saying, why am I being held? That goes to show that a reasonable, prudent person under his circumstances would believe that they're being not only held, but they're in custody and they're a suspect. If you believe the state's argument and that my client was only a witness, why is a witness asked to give a lie detector test? The only thing I can implore is because he was a suspect at the time that he was taken from the scene. Now, in order to go towards the tip itself, I asked to take a look at the state. I think this construes the facts here. They said it is that the caller identified a setup man, but a setup man was never described. What do they mean? The court made this jump to, oh, that's right. The officers told us that Mr. Mays made a phone call, but Mr. Brett's made a cross-examination on Detective Griffith and said this. Tell me everything you knew at the time you decided to place the defendant under arrest. Officer Griffith testified. Terrell Jackson and Reginald Martin had the guns and believed we were taking them to Aurora. Further, the only thing the officer testified to, the only thing that Smith and Berry stated was that the defendant was presented, was present, and a cell phone was made. How does that establish reliability for this person who is allegedly a tipster? Even the court has stated that they couldn't really give much veracity to it, but because of this term setup man, they made a jump. But if you recall, that tipster said there was one black man because they never described a second one, so we don't know whether that second person was black. The only thing we knew is they got the nicknames wrong. They said the person had pot marks on their face. That's why they believe went by potty. Not a physical description of either one of the defendants, Mr. Mays or more. But let's also not forget there was other people at the police station. There was either Smith or Berry was still there at the time that that tip came in. So now, instead of only two people at the police station, there's more than that. That is not corroborative. And what about the three people who left at the time before the shooting occurred? Couldn't it be a fabrication that they wanted to get other people in trouble because they knew the light was going to be looked at them? Isn't that the problem with tipsters? We want to make sure there is no fabrication that the police go and do their job and corroborate. Now they have a name. They got Justin Harper. Fine. Go investigate. They didn't do it. The first time Mr. Martin's name ever came up was with the tipsters. It wasn't given by a barrier Smith. So now what you have by the court is saying now probable cause exists because the tip was corroborated. That tip wasn't corroborated until after they were placed under arrest, which is inappropriate in the guidelines of the Constitution. Thank you. I know that looking at a murder case, no trial court wants to grant a motion to cross arrest and suppress evidence or suppress statements because of nature of the charge. I'm asking this appellate court to look beyond that, look in the confines of the Constitution and the case law that presented before you. I'm asking the court to find that they were in custody, find that they were in custody at the time that they were transported to the police department. Any statements that they gave violated not only the eavesdropping statute, but also violated the homicide statute when statements can be recorded. And even if the court believes that they were there free and voluntary, look at the actions of the defendant. Look at the actions of the officers who would not let them freely go. And I ask that you reverse the trial court's finding. Thank you very much. Thank you, counsel. The court will take this matter under advisement and we will dispatch post haste and we will take a panel change for the next case.